JOURNAL ENTRY AND OPINION
{¶ 1} Rontae Perkins appeals from a judgment of conviction entered by Judge John P. O'Donnell after a jury found him guilty of aggravated robbery, aggravated burglary, and carrying a concealed weapon. He claims, among other errors, violations of due process and the hearsay rule, insufficient evidence, and prosecutorial misconduct. We affirm.
 {¶ 2} From the record we glean the following: In June 2003, Perkins was indicted on two counts of conspiracy to commit aggravated murder,[1] two counts of kidnapping,[2]
two counts of aggravated burglary,[3] two counts of aggravated robbery,[4] two counts of felonious assault,[5] all with one- and three-year firearm specifications, one count of failure to comply with the order or signal of a police officer,[6] and one count of carrying a concealed weapon.[7] These charges arose from four men entering the home of Crystal Szell in an apparent attempt to find money that her nephew, Richard Horvath III ("Horvath") had purportedly stolen from Jarrett Doss,[8] an alleged drug dealer in Virginia.[9]
 {¶ 3} At trial, Horvath testified that during his middle school years he lived with his mother in Danville, Virginia, where he became friends with Doss, a classmate. When he moved to Cleveland to be with his father in 1999, they remained friends, and Doss loaned money to Horvath's mother. When she was unable to repay it, Horvath claimed that Doss began to threaten her, which prompted him to contact the Virginia DEA in December 2002, to "snitch" on Doss, although he continued the facade of friendship.
 {¶ 4} In May 2003, when Horvath and his father traveled with Doss to Georgia, Doss was indicted on drug-related charges, and Horvath suspected that Doss would learn that he had been the informant. He became nervous and, when Doss was away, he stole a suitcase containing roughly $200,000[10] from Doss's closet and immediately left for the Szell home in Cleveland One month later, Perkins, Quentin Pinchback, Carl West, and Curtis Gregory rented a van in Virginia, packed it with firearms, and drove to Cleveland
 {¶ 5} Michael Saler, who worked for Szell's cleaning company and whose sister dated Horvath's father, testified that Szell told him Horvath had stolen money from Doss. He also claimed that he and his sister were accosted in a parking lot by two or three men with guns, were told that they were looking for Horvath because of the money, and that they knew where he and his sister lived and would kill them if they associated with Horvath. He contended that he contacted Doss out of fear for his sister's safety and offered to help find the money.
 {¶ 6} Saler said he got a phone call and was told to meet with Perkins and his companions at a Brookpark Road Budget Inn. In their van, he drove Perkins, West, Gregory, and Pinchback to the Szell home. The group returned to the motel and Saler claimed that Perkins told him to come back in two hours. When he returned, he said that Perkins told him that he wanted to get inside Szell's house, tie her up and hold her hostage to force Horvath and his father to them.
 {¶ 7} Saler, driving his own car, led the men in their van back to Szell's home. The van stopped down the street from the residence to await Saler's predetermined signal that the men could enter. When Saler spoke with Szell, however, he learned that she and her daughter were leaving for dinner, so he drove to the van, got in and drove it to Szell's home, where the others exited, and he drove off.
 {¶ 8} Saler said he received a cellular call from Perkins ordering him back to the house, and when he arrived, he saw Szell in front with a cell phone. The four men, with guns tucked into their waistbands, then jumped into the van and ordered him to drive away. A police chase, with zone cars from two jurisdictions, ended in a fast food parking lot. The five suspects ran but were eventually apprehended.
 {¶ 9} Perkins was sentenced to seven years in prison and advised of post-release control. His assignments of error are set forth in the appendix to this opinion.
I. HEARSAY STATEMENTS
 {¶ 10} Perkins claims that the statements of co-defendants Gregory and Pinchback were wrongly admitted at trial, violating the hearsay rule and denying him the right of confrontation. Officer Dirk Halschiedt testified that Gregory told him that his reason for being in Cleveland on June 9, 2003, was that he was "on vacation traveling to North Dakota."[11] Special Agent Joseph Oliver testified that Pinchback told him he came to Cleveland to find a "good party" because the Cleveland Cavaliers had just drafted LeBron James.
 {¶ 11} Prior to Agent Oliver's testimony, the judge, in accord with Richardson v. Marsh,[12] told him he was not to reference by name any comments Pinchback made about his co-defendants.[13] He testified to the following:
"Mr. Pinchback told me that he — that he came to Cleveland forthe purpose of finding some parties because Lebron James hadrecently been drafted by the Cleveland Cavaliers and he figuredthat it would be a good place to go to party.
 He said that he traveled here in a van with — that someoneelse rented and he stayed in a hotel room on Brookpark Road. Hesaid — he told me that he went into a room with several otherpeople, and a White male and from there, they got back in thevan, and they began basically touring the Cleveland — greaterCleveland area. He's never been here before and he didn't knowwhere he was going or what they were supposed to be lookingfor."
 {¶ 12} Perkins claims that his rights under Bruton v. UnitedStates[14] were violated when he was denied the opportunity to cross-examine Pinchback on these statements.
 {¶ 13} In Bruton, supra, the United States Supreme Court held that the admission of a non-testifying co-defendant's confession, which clearly implicated another defendant at a joint trial, was a violation of that defendant's rights under the Confrontation Clause, and noted that the non-testifying co-defendant's confession "added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since [the co-defendant] did not take the stand"[15] The rationale was that a co-defendant's confession that implicates another defendant is both "devastating to the defendant" and inherently untrustworthy "given the recognized motivation to shift blame onto others."[16] This rule, however, is not absolute. Several exceptions have been carved out in cases where the co-defendant's statements have been redacted to the point where they do not name or reasonably implicate the defendant.[17]
 {¶ 14} In Richardson,[18] the United States Supreme Court limited the application of Bruton, and held that, with respect to redacted confessions, the Confrontation Clause is not violated when the confession is edited to eliminate not only the defendant's name, but any reference to his existence. The Court noted that Bruton applied when the co-defendant's confession "expressly implicated the defendant as his accomplice," and the testimony would prove "powerfully incriminating."[19]
 {¶ 15} Moreover, in his final charge to the jury, the judge instructed that:
"A statement by one Defendant made outside the presence of theother Defendants is admissible as to the Defendant making suchstatement and must not be considered for any purpose as evidenceagainst the other Defendants."[20]
 {¶ 16} In the instant case, the judge not only provided a detailed testimonial instruction under Richardson, he gave a limiting instruction advising the jury not to construe the statements made by one defendant against another defendant, and Perkins has failed to prove that Agent Oliver's testimony caused actual prejudice that would warrant reversal.
 {¶ 17} A review of the testimony shows that neither statement attributed to Gregory or Pinchback expressly nor impliedly implicated Perkins and, therefore, neither statement constituted "powerfully incriminating" evidence against him. We do not find that the testimony reiterating the activities of Gregory or Pinchback was so powerfully incriminating that the jury would not be able to abide by the judge's cautionary instruction.
 {¶ 18} Perkins also contends that the statements of his co-defendants are hearsay, although he fails to cite any specific testimony that would qualify as hearsay under Evid.R. 801 or any applicable law. He cites to Evid.R. 801(C), which states in pertinent part:
"Hearsay is a statement, other than one made by the declarantwhile testifying at the trial or hearing, offered in evidence toprove the truth of the matter asserted."
 {¶ 19} The crux of the statements made by Pinchback and Gregory set forth their reasons for being in Cleveland on a particular day and were unrelated to any association with Doss or an attempt to re-capture stolen money, and neither admitted statement was offered for the truth of the matter asserted.[21]
 {¶ 20} Although all three men were on trial together, and the jury heard statements admissible as against his co-defendants, Perkins was acquitted on all charges related to conspiracy, i.e., conspiracy to commit aggravated murder and kidnapping. Therefore, any claim that potentially prejudicial hearsay somehow furthered the State's theory of conspiracy is unfounded, and any potential hearsay implications were cured by the judge's corrective instruction. The first assignment of error lacks merit.
II. DUE PROCESS
 {¶ 21} Perkins next claims that he was denied due process when the judge refused to order the State to produce statements Horvath made to the DEA in Virginia as part of an ongoing federal grand jury investigation. He claims that "the garbage argument that some law enforcement officers have the power to exclude relevant evidence from a criminal trial, and then tell us, without proof, disclosure would compromise some ongoing investigation,"[22] is inapplicable here.
 {¶ 22} After the first day of Horvath's testimony, the defense attorneys collectively moved to have his statements to the Virginia DEA disclosed for their review claiming that, in those statements, he may have implicated their respective clients.
 {¶ 23} Horvath made one oral and two written statements to the DEA. The judge, after reviewing the two written statements, found them to contain several inconsistencies, and asked for a written summary of the oral statement made to agent David High in approximately December 2002.
 {¶ 24} The Ohio Supreme Court set forth the standard for considering the release of grand jury testimony and held that "* * * [g]enerally, proceedings before a grand jury are secret and an accused is not entitled to inspect grand jury minutes before trial [or at trial] * * *. This rule is relaxed only when the ends of justice require it, such as when the defense shows that a particularized need exists for the minutes which outweighs the policy of secrecy."[23]
 {¶ 25} In the instant case, Perkins did not establish at the trial level or on appeal that he had a particularized need for Horvath's statements. Horvath testified and admitted that he lied to the DEA when first approached, stating that he had no information about Doss's activities, and that only later did he decide to cooperate with the authorities. Horvath was cross-examined extensively on his statements to the Virginia DEA, and any inconsistencies were pointed out for the jury's consideration, including Horvath's own testimony on cross-examination that he had been deceptive in his relationship with Doss.[24]
 {¶ 26} Moreover, in light of the fact that Horvath was offering information to the DEA about Doss and his drug-related activities, and that Perkins was not convicted on any charges stemming from any conspiracy with or association with Doss, this contention that the suppression of the statement somehow gave credence to the State's theory of a drug enterprise relationship between Doss and Perkins was disproved. This second assignment of error lacks merit.
MISTRIAL
 {¶ 27} Perkins claims it was error to deny his motion for a mistrial because the prosecutor attempted to elicit inadmissible evidence.
 {¶ 28} The standard of review for evaluating a trial judge's decision to grant or deny a mistrial is abuse of discretion.[25] Mistrials need to be declared only when the ends of justice so require and a fair trial is no longer possible.[26] This is because the judge is in the best position to determine whether the circumstances of the case necessitate the declaration of a mistrial or whether other corrective actions are sufficient.[27] A reviewing court may not substitute its judgment for that of the trial court absent an abuse of this discretion.[28]
 {¶ 29} Perkins cites no law in support of his contention, stating only that the opportunity to defend the charges as set forth in the indictment was diluted, and that one does not have to be a "rocket scientist" to realize that the evidence presented suggests a lifestyle.[29] Under App.R. 12(A) and 16(A)(7), we decline to address an assignment of error that lacks any supporting legal authority. This third assignment of error lacks merit.
EVIDENCE RULE 404(a)
 {¶ 30} Perkins next claims that he was denied a fair trial and due process because, in violation of Evid.R. 404(A), the State introduced character evidence through Horvath's testimony. We note, however, that he does not cite to a portion of the transcript where he contends the State misled the jury or introduced evidence of his character or reputation, although he does point out Horvath's statement that Doss had a reputation for being a "bad dude."[30]
 {¶ 31} During trial, Horvath discussed the circumstances surrounding his theft of Doss's money. He claimed that, before meeting Doss in North Carolina and traveling with him to Georgia, he had gone to the Virginia DEA and offered information concerning Doss's drug activities, which ultimately led to Doss's indictment. When Doss appeared before the grand jury, Horvath feared that Doss would then know that he had supplied the incriminating information and would have him killed, so he stole Doss's suitcase containing the money. When discussing his fear of being killed, the following exchange took place during direct examination:
"Q: Why do you feel that Jarett might have you killed?
• Mr. Vegh: Objection
• The Court: Overruled.
 A: Because if he found out anything, then he would probablyhave me killed.
 Q: Did you know that Jarett had killed other people?
• Mr. Willis: Objection
• * *
Q: Had you seen or had you seen anybody else that worked forJarett kill anybody else?
• Mr. Willis: Objection, your Honor.
• Mr. Vegh: Objection.
 The Court: Let me ask it to you this way, sir. Was there someconcrete reason why you thought that this guy would have youkilled?
• The Witness: His reputation.
 The Court: Okay. Continue, please.
 Q: All right. What do you mean by that, his reputation.
• Mr. Willis: Objection.
• Mr. Pinto: Objection.
• The Court: Overruled.
 A: He's just known as a bad dude."
Evid. R. 404(A)(1) states in part: "(A) Character evidencegenerally. Evidence of a person's character or a trait of hischaracter is not admissible for the purpose of proving that heacted in conformity therewith on a particular occasion, subjectto the following exceptions:(1) Character of accused. Evidence ofa pertinent trait of his character offered by an accused, or bythe prosecution to rebut the same is admissible; however, inprosecutions for rape, gross sexual imposition, and prostitution,the exceptions provided by statute enacted by the GeneralAssembly are applicable."
 {¶ 32} Horvath's only testimony about his knowledge of Perkins was to state that he knew him and had seen him with money.[31] To claim that information about Doss's reputation could then allow the jury to infer Perkins' guilt is speculation at best, and not violative of Evid.R. 404(A). This fourth assignment of error lacks merit.
QUESTIONING BY THE JUDGE
 {¶ 33} Perkins next submits that, during Horvath's testimony, the judge asked him for information about Perkins' involvement in Doss's drug activities, thereby leading the jury to presume that the State and the judge were working in concert.
 {¶ 34} On direct examination, the prosecutor questioned Horvath about Perkins' activities in relevant part:
"Q: Okay. Did you ever see him doing anything to help Jarrettin this drug enterprise?
• Mr. Willis: Objection.
 The Court: You're asking him about his personal knowledge ofany activities of defendant Rontae Perkins?
 Mr. Norman: Yes, Judge.
 The Court: And his personal knowledge?
 Mr. Norman: Right.
 The Court: Overruled."
 {¶ 35} We cannot see how this passage is so tainted as to present the jury with the impression that the judge and the prosecution were working together to such an extent that he "was no longer an impartial and unbiased arbiter, but had . . . assumed the posture of an advocate."[32]
 {¶ 36} Contrary to counsel's assertion that the judge asked the prosecutor to query the witness about his personal knowledge of Perkins' drug activities, the transcript reveals that he was attempting to limit the scope of a potential hearsay issue and determine the validity of an objection, as he was entitled to do under Evid.R. 611.
 {¶ 37} Evid. R. 611 states in relevant part:
"Mode and order of interrogation and presentation.
 (A) Control by court. The court shall exercise reasonablecontrol over the mode and order of interrogating witnesses andpresenting evidence so as to (1) make the interrogation andpresentation effective for the ascertainment of the truth, (2)avoid needless consumption of time, and (3) protect witnessesfrom harassment or undue embarrassment."
 {¶ 38} Further, "[u]nder Evid.R. 611, the court has discretion to control the flow of the trial. This control includes asking questions of the participants and the witnesses in a search for truth. Evid.R. 614. Since a judge's powers under Evid.R. 611 and 614 are within his discretion, a court reviewing a judge's interrogation of witnesses and comments must determine whether the judge abused that discretion."[33] Although Perkins cites Anderson v. Sheppard, supra, as authority,Anderson involved a judge who refused a plaintiff, who had fired two lawyers, additional time to hire other counsel. Then, citing to a criminal case involving a pro se defendant who went to jail, inferred to this now pro se plaintiff, that a man who represented himself had a fool for a client.
 {¶ 39} The judge's conduct in the instant case does not compare with the egregious conduct in Anderson, and there is no evidence that the judge abused his discretion in determining the depth of the examination under Evid.R. 611. The fifth assignment of error lacks merit.
SUFFICIENCY OF THE EVIDENCE
 {¶ 40} Perkins contends that the evidence produced was insufficient to support his convictions. A sufficiency claim presents a question of law that we review de novo[34] to determine "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[35] Perkins was convicted on two counts of aggravated robbery, two counts of aggravated burglary and carrying a concealed weapon. To prove the elements of the charges, the State first called Horvath to clarify how he, and Doss's money, got to Szell's home. Both Horvath and his father testified that Perkins, West, and the others were known to be Doss's associates, and that both men had seen the group together in Danville, Virginia, during their interactions with Doss. This relationship was further solidified by the testimony of Michael Saler.
 {¶ 41} After Saler contacted Doss, an intermediary ultimately directed him to a motel where he was greeted by Perkins and, although there were other men in the room who were loading bullets into machine guns and other weapons, Perkins was the only one to speak with him. Perkins asked him about the stolen money, inquired as to where he could find Horvath and his father, and explained how they planned to force Szell to disclose the whereabouts of Horvath and his father. Saler drove Perkins and three others in their van on two occasions. On the second occasion, Saler dropped them off at Szell's home and, after Perkins' frantic call, picked them up from there.
 {¶ 42} Following the police chase, a store owner testified that he found Perkins trying to hide, that Perkins offered him money to call a cab and, when he refused to help him escape, Perkins left on foot and was arrested crossing the street.
 {¶ 43} Szell's teenage daughter testified that when she entered her home to retrieve rented videotapes, she discovered it had been ransacked and an ax handle was lying next to the sofa. She also noticed that all four burners on the stove were ignited, and saw several armed men at the house. She identified Perkins as the tall, African-American man she saw holding the door of the van in front of her house to let other men running from her home get inside.
 {¶ 44} Ms. Szell testified that the drawers in nearly all of her furniture had been opened and the contents dumped on the floor in an apparent search for money, and that an envelope containing $1,600 was missing after the incident.
 {¶ 45} Based on the combined testimony of these witnesses, reasonable minds could conclude that the elements necessary for aggravated burglary, aggravated robbery, and carrying a concealed weapon were proven beyond a reasonable doubt.
 {¶ 46} Although Perkins claims that the evidence produced at trial showed little more than his presence in the home, and that evidence pointed only to his association with other co-defendants, the judge cured any potential confusion between actions assisting his co-defendants and those specifically attributed to Perkins. In his charge, he instructed the jury on the legal definition of aiding and abetting by stating "aided or abetted means supported, assisted, encouraged, cooperated with, advised or incited."[36] Because of the evidence produced at trial, and the judge's additional jury instruction, this sixth assignment of error lacks merit.
JURY INSTRUCTIONS
 {¶ 47} Perkins next contends that the judge abused his discretion by failing to give a proposed jury instruction on "mere presence." The standard of review is whether a refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case.[37] A judge has discretion as to the language of the instructions to the jury and is not bound by the requested language of counsel.[38] The judge ordinarily should give a requested jury instruction if it is a correct statement of law, which is applicable to the facts in the case, and reasonable minds might reach the conclusion sought by the specific instruction.[39]
 {¶ 48} Further, when reviewing jury instructions, an appellate court must examine the entire jury charge.[40]
Perkins' proposed instruction reads in its entirety:
"Of course, mere presence at the scene of an event, or themere fact that certain persons may have associated with eachother, and may have assembled or even been together, does notnecessarily establish proof of the existence of a conspiracy. Infact, close association with persons is insufficient to proveknowing participation in a conspiracy. Also, a person who has noknowledge of a conspiracy, but who happens to act in a way whichadvances some purpose of a conspiracy, does not thereby become aconspirator. It is a cardinal rule of conspiracy law that onedoes not become a conspirator simply by virtue of his or herassociation with conspirators. The essence of conspiracy is theagreement to engage in concerted unlawful activity. To connectthe defendant to a conspiracy, the prosecution must demonstratethat the defendant agreed with others to join the conspiracy andparticipate in the achievement of the illegal objective."
 {¶ 49} As noted by the State, although the judge did not give the jury instructions on "mere presence," he did instruct the jury that Perkins must have acted "knowingly," as defined by R.C.2901.22(B), with respect to the aggravated burglary, aggravated robbery, and carrying a concealed weapon counts.[41]
 {¶ 50} Moreover, after the jury instructions were given, Perkins did not object to the judge's failure to give the instruction and instead raises this issue for the first time on appeal. However, even an examination of the evidence illustrates that such an instruction was inappropriate.
 {¶ 51} Perkins claims that he was merely present in the area and was a passenger in what turned out to be a getaway car. What he ignores, however, is his involvement in the meeting with Saler and the other co-defendants at the Budget Inn, his call to Saler for a pick-up at the Szell residence immediately following the break-in, his escape on foot after the van stopped, his attempted bribe of a store owner to facilitate his escape, his eventual apprehension, and eyewitness identification by Szell's daughter. The seventh assignment of error lacks merit.
PROSECUTORIAL MISCONDUCT
 {¶ 52} Although again citing no law to support his contentions, and citing only one statement made by the prosecutor, Perkins claims error by virtue of prosecutorial misconduct in the form of "numerous telling, damaging and prejudicial innuendos," impermissibly leading questions and false facts.
 {¶ 53} A claim of prosecutorial misconduct must show that the challenged conduct was improper and that the improprieties deprived a defendant of a fair trial.[42] Claims of prosecutorial misconduct are subject to the plain error rule, meaning that unless the defense objected to the purported acts of misconduct, all but plain error is waived.[43]
 {¶ 54} Perkins references the prosecutor's opening statement referring to Doss as, "the big time drug dealer that lives in the southern United States" who sent Perkins and others to Cleveland[44] He next references his pre-opening statement objection to matters that would possibly be mentioned in the prosecution's opening statement which might be "seriously questionable,"[45] yet, never indicating on appeal what these questionable matters were.
 {¶ 55} The court in State v. Hill[46] outlined four elements to be considered in determining whether the prosecutor's statements amount to misconduct: (1) the nature of the remarks; (2) whether an objection was made by opposing counsel; (3) whether corrective instructions were given; and, (4) the strength of the evidence against the defendant. The Ohio Supreme Court added an additional factor to be considered in determining whether remarks constitute misconduct, that is, whether the remarks prejudicially affected substantial rights of the defendant.[47]
 {¶ 56} Perkins claims the prosecutor's statements were unduly prejudicial, however, each statement with which he takes issue involves the State's "Conspiracy theory" or "Murder for hire" theory, charges on which Perkins was acquitted. Any potential prejudice, therefore, was cured when the jury found him not guilty on any conspiracy counts.
 {¶ 57} Second, many instructions were given to the jury outlining the charges against Perkins and instructing it, not only on charges which related to conspiracy, but also on the proper mens rea for each crime. In addition, as discussed under the sufficiency of the evidence argument, there was a plethora of evidence available for the jury's consideration when determining Perkins' guilt. Further adding credence to this argument is counsel's failure to object to those matters which he deemed prosecutorial misconduct, and his failure to illustrate how the prosecutor's statements impacted his ability to obtain a fair trial.
 {¶ 58} In light of the evidence presented at trial, the jury's acquittal on a number of the charges, and absent any evidence that the prosecutor's comments deprived Perkins of a fair trial, we cannot say that the questioned comments were prejudicial. The eighth assignment of error lacks merit.
Judgment affirmed.
 APPENDIX ASSIGNMENTS OF ERROR:
 "I. The court erred by admitting certain egregiouslyprejudicial hearsay statements made by non-testifying defendants,which statements not only violated the defendant's constitutionalrights, but also the hearsay rule.
 II. Given that none of the identification witnesses (with theexception of the witness michael saylor) included any direct oreven indirect references to this defendant in their prior writtenstatements, it follows that the court's unwillingness to requirethe state to produce various statements made by the witnessrichard horvath, III to the dea (even for an in camerainspection by the court) deprived the defendant of due process.
 III. The court erred when it denied the defendant's motion fora mistrial.
 IV. The court erred, and the defendant was denied both a fairtrial and due process, when the court allowed the prosecutor toelicit testimony which violated rule 404(a), rules of evidence.
 V. The defendant was denied due process when the court, inthe wake of a certain question put to the state's chief witness,not only endorsed the state's theory, but Assumed the positionof an advocate.
 VI. The evidence on the basis of which the defendant wasconvicted was insufficient to support any findings of guiltbeyond a reasonable doubt.
 VII. The court erred, or abused its discretion, when itrefused to give the defendant's requested instruction on "merepresence."
 VIII. The prosecutor was guilty of misconduct when heintentionally resorted to the use of devastating innuendoes andinsinuations; as well as, arguably "false facts" andimpermissibly leading questions, in his all out quest forconvictions in this case."
It is ordered that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, J., And Rocco, J., Concur
[1] R.C. 2923.01.
[2] R.C. 2905.01.
[3] R.C. 2911.11.
[4] R.C. 2911.01.
[5] R.C. 2903.11.
[6] R.C. 2921.331.
[7] R.C. 2923.12.
[8] We note that Perkins consistently refers to this individual as "Jarred," yet the transcript and various other documents list "Jarrett" as the proper spelling. We have utilized the spelling provided in the transcript for purposes of appeal.
[9] Perkins' co-defendants, Carl West, CA 83799, Curtis Gregory, CA 83651, Quentin Pinchback, CA 83757, and Michael Saler were all similarly charged. With the exception of Michael Saler, their appeals are pending in this Court.
[10] Horvath maintained that he stole only $200,000 from Doss, although other testimony indicated that the amount stolen was closer to $750,000.
[11] Tr. at 2028-2029.
[12] (1987), 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176.
[13] Tr. at 1874-1876.
[14] (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.
[15] Id. at 128.
[16] Id. at 136.
[17] See Richardson v. Marsh, supra; In re Watson (1989),47 Ohio St.3d 86, 91, 548 N.E.2d 210.
[18] Richardson, supra, at 211.
[19] Richardson, supra, at 208, citing Bruton, supra, at 124, See fn. 1, and 135.
[20] Tr. at 2297.
[21] Evid.R. 801 and 802; See, also, State v. Lamar,950 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166.
[22] Appellant's Brief at 22.
[23] State v. Mack, 73 Ohio St.3d 502, 508, 1995-Ohio-273,653 N.E.2d 329, citing State v. Laskey (1970),21 Ohio St. 2d 187, 191, 257 N.E.2d 65.
[24] Tr. at 852.
[25] State v. Sage (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 510 N.E.2d 343.
[26] State v. Franklin (1991), 62 Ohio St.3d 118, 127,580 N.E.2d 1.
[27] Quellos v. Quellos (1994), 96 Ohio App.3d 31, 41,643 N.E.2d 1173.
[28] Id.
[29] Appellant's Reply Brief at 6.
[30] Tr. at 496.
[31] Tr. at 510-513.
[32] Appellant's Brief at 30, quoting Anderson v. Sheppard
(C.A.6, 1988), 856 F.2d 741, at 747.
[33] State v. Prokos (1993), 91 Ohio App.3d 39, 44,631 N.E.2d 684.
[34] State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, 678 N.E.2d 541.
[35] State v. Stallings, 89 Ohio St.3d 280, 289,2000-Ohio-164, 731 N.E.2d 159, quoting Jackson v. Virginia
(1979), 443 U.S. 307, 319, 99 S.Ct. 2781.
[36] Tr. at 2329.
[37] State v. Wolons (1989), 44 Ohio St.3d 64, 68,541 N.E.2d 443.
[38] Jenkins v. Clark (1982), 7 Ohio App.3d 93, 100,454 N.E.2d 541, at paragraph five of the syllabus.
[39] Murphy v. Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585,591, 575 N.E.2d 828, citing Markus Palmer, Trial Handbook for Ohio Lawyers (3 Ed. 1991) 860, Section 36:2.
[40] Snyder v. Stanford (1968), 15 Ohio St.2d 31,238 N.E.2d 563, at paragraph three of the syllabus.
[41] Tr. at 2313-2314.
[42] State v. Phillips, 74 Ohio St.3d 72, 90, 1995-Ohio-171,656 N.E.2d 643.
[43] State v. Slagle (1992), 65 Ohio St.3d 597, 604,605 N.E.2d 916.
[44] Tr. at 422.
[45] Tr. at 399.
[46] (1977), 52 Ohio App.2d 393, 370 N.E.2d 775; See, also,State v. Saddler (Oct. 21, 1999), Cuyahoga App. No. 74218.
[47] State v. Smith (1984), 14 Ohio St.3d 13, 14,470 N.E.2d 883.