[Cite as *State v. Williams*, 2019-Ohio-2657.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-17-1186

        Appellee                               Trial Court No. CR0201602818

v.

Alexander Williams                        **DECISION AND JUDGMENT**

        Appellant                              Decided:  June 28, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Alexander Williams, appeals the judgment of the Lucas County

Court of Common Pleas, convicting him, following a jury trial, of one count of the lesser

included offense of murder in violation of R.C. 2903.02(A), an unspecified felony, with

an attendant firearm specification in violation of R.C. 2941.145.  For the reasons that

follow, we affirm, in part, and reverse, in part.

## I. Facts and Procedural Background

{¶ 2} On September 30, 2016, the Lucas County Grand Jury entered a two-count indictment against appellant, Demarcus Lawhorn, and Davonte Nicholson, charging them with one count of aggravated murder in violation of R.C. 2903.01(A), an unspecified felony, and one count of felony murder in violation of R.C. 2903.02(B), an unspecified felony. Both counts carried attendant firearm specifications pursuant to R.C. 2941.145. Appellant entered an initial plea of not guilty, and the matter proceeded to a jury trial with his co-defendant, Davonte Nicholson.

{¶ 3} During voir dire, the state challenged three jurors for cause. The state argued that all of the jurors had criminal convictions, but they did not so respond when asked whether they had ever been accused of a crime. The trial court granted the for-cause challenges, and dismissed the three jurors. The state and Nicholson then exercised one peremptory challenge each, which required the trial court to bring five new potential jurors onto the panel. After several more peremptory challenges, appellant preemptively objected to the state's projected challenge to one of the five new jurors, raising a *Batson* issue. Counsel for appellant asserted that the state only pulled the criminal records for the African-American jurors. The state responded, with regard to the challenged juror, that the juror was convicted of a misdemeanor OVI, but he did not disclose the conviction when asked under oath whether he had been accused or convicted of any crimes. Further, the state commented that it had been pulling the records of almost all of the other jurors regardless of race, ethnicity, or national background. Upon hearing counsel's arguments, the trial court denied the state's request to dismiss the juror for cause. The state then

2.

exercised its peremptory challenge to excuse the juror. Appellant again objected and raised a *Batson* challenge, arguing that the state had excluded every African-American juror up to that point. The state countered that it was excusing the challenged juror because the juror was not forthcoming when asked if he had been accused of a crime, either a misdemeanor or a felony, which the state argued demonstrated that the juror did not uphold his oath to be truthful. The trial court then denied appellant's objection, finding that the state's peremptory challenge of this juror was not based on race, but rather on the failure to disclose the misdemeanor conviction.

{¶ 4} After the jury was eventually seated, the trial began, and the state called A.T. as one of its witnesses. A.T. was the girlfriend of George David Smith, the victim. A.T. testified that on September 9, 2016, she and Smith were travelling in a car with six children to go to a birthday party for Smith's son. On the way, they stopped at a 7-Eleven on Western Avenue in Toledo, Ohio, to grab some pizzas. A.T. stated that she went into the store to order the pizzas, and Smith stayed with the car. A.T. commented that it took longer than usual to make the two pizzas. While she was waiting, she went in and out of the store, checking on the pizzas, checking on the kids, talking to Smith, and smoking some cigarettes.

{¶ 5} A.T. testified that after she returned to the car with the pizzas, while they were backing up, Smith said "Oh shit, the ops." A.T. understood the "ops" to mean an enemy or opposition. A.T. testified that she then observed Demarcus Lawhorn walking up alongside the passenger side of the car where she was sitting. Lawhorn continued around to the front of the car and then to the driver's side as if to challenge Smith to a

3.

fight. Meanwhile, a second person, who was dark-skinned, tall, and skinny, approached the car on the driver's side. A.T. testified that the second person was wearing a white t-shirt and a do-rag on his head, but she did not see the person's face because it was mostly above the car window. A.T. also identified that a third person was present, behind the second person. The second person then said "Where's my shit now," and shot Smith. Smith ultimately died from the gunshot wound.

{¶ 6} The next day, the 7-Eleven clerk came to A.T.'s house, gave her a hug, and said "I didn't know they were going to do that to him." A.T. testified that she did not know the clerk, and that she was confused at how the clerk determined where she lived.

{¶ 7} The state later called Jacquelen Garza as a witness. Garza was the 7-Eleven clerk working at the time Smith was shot. Garza testified that as a result of her conduct on September 9, 2016, she was charged with complicity to murder, obstruction of justice, and tampering with evidence. She entered into a plea agreement with the state to plead guilty to the reduced charge of complicity to involuntary manslaughter in exchange for her testimony against appellant and Nicholson. Garza testified that she has known appellant for 10 years, and that she used to buy drugs from him. She had also met Nicholson several times, and described him as tall and skinny. Garza stated that she was aware that appellant, Nicholson, and Lawhorn knew each other and spent time with each other.

{¶ 8} Garza testified that on September 9, 2016, she was working at the 7-Eleven when she saw Smith in the parking lot. Garza then called appellant to tell him that Smith was there. Garza made the call to appellant because earlier in the summer, appellant had

4.

shown Garza a picture of Smith, and told her that Smith had robbed him. According to Garza, appellant stated that he was going to kill Smith because of the robbery. Garza testified that appellant was serious when he said that he was going to kill Smith, and "[appellant] knew what his intentions were." However, Garza also testified that she believed that appellant was just going to fight Smith. Upon receiving the phone call on September 9, 2016, appellant informed Garza that he was coming to the 7-Eleven. After Garza gave the pizzas to A.T., appellant called back and asked if Smith was still there, and told Garza to stall them.

{¶ 9} Garza then observed appellant, Lawhorn, and Nicholson pull into the parking lot in a Buick Rendezvous, and stop behind Smith's car. Lawhorn approached the car on the passenger's side, and Nicholson and appellant approached on the driver's side. Nicholson went to the driver's window and appellant stayed further back, behind an adjacent car. Garza testified that she then saw Nicholson put the gun up to the window and shoot.

{¶ 10} Following the shooting, Garza received another phone call from appellant. During the call, appellant told her that it was done and over with, and not to worry about it because Smith was dead. Garza testified appellant also told her that if she said anything he would "get" her too.

{¶ 11} Thereafter, Garza spoke with the police on several occasions, and her story changed each time. Garza stated that it was not until after she was indicted that she began telling the complete truth.

5.

{¶ 12} During a break in Garza's testimony, before the second day of trial began, it came to the court's attention that one of the jurors indicated that her grandson may have been married to A.T. The juror was unsure whether her grandson and A.T. had any children together, stating "I don't know. I was told all four of them supposed to have been his, but I'm not for sure. I can't tell you that." The juror then indicated that the relationship between her grandson and A.T. would not have any impact on her being a fair and impartial juror. She also stated that it would not impact her ability to be a fair and impartial juror if one of the children in the car at the time Smith was shot was one of her great-grandchildren. The state and defense counsel were then both given an opportunity to question the juror or to object to her continued service, which they declined.

{¶ 13} Toledo Police Detective Kristi Eycke then testified for the state by way of a previously recorded video deposition. Eycke testified that on September 10, 2016, a Buick Rendezvous matching the description of the one used in the shooting the previous day was found burned in an alley approximately one mile from the 7-Eleven. Singed pieces of paper separately containing the names of Devontae Nicholson and Demarcus Lawhorn were found in and near the Rendezvous.

{¶ 14} The state next called L.B. L.B. was the girlfriend of Demarcus Lawhorn. L.B. testified that on September 9, 2016, Lawhorn used her Buick Rendezvous to go out and get food. When Lawhorn returned to drop off the food, L.B. observed appellant and Nicholson in the car with him. L.B. testified that Lawhorn, appellant, and Nicholson are

6.

all friends, and that Garza was friends with appellant. L.B. also explained that Garza had a child with L.B.'s brother. L.B. then identified her vehicle, as well as Lawhorn, appellant, and Nicholson, in pictures from the 7-Eleven.

{¶ 15} Lawhorn testified next for the state as part of his plea agreement. In exchange for his testimony and guilty plea, the state offered to amend the charges of aggravated murder and felony murder to involuntary manslaughter with a gun specification and felonious assault. Lawhorn testified that he has known appellant for nearly his entire life, and has known Nicholson for the past several years.

{¶ 16} Lawhorn recounted that the previous summer, 2015, he was hanging out with appellant at a house when two assailants entered. Lawhorn testified that Smith was one of the assailants, and that Smith held a gun up to the back of Lawhorn's head, then took their guns, cell phones, three or four pounds of marijuana, and $3,000 in cash from appellant.

{¶ 17} Turning to September 9, 2016, Lawhorn testified that he was with appellant and Nicholson after dropping off food to L.B., when appellant received a phone call from Garza informing him that Smith was at the 7-Eleven. Lawhorn was actually out of the car talking to other people at the time of the call, and appellant yelled for him to come back. Lawhorn testified that he then drove to the 7-Eleven at a high rate of speed. According to Lawhorn, there were no discussions in the car while they were driving to the 7-Eleven. When they arrived, Lawhorn stopped his car behind Smith's to block him. Lawhorn then approached from the passenger side of Smith's vehicle saying "What's up," as if to challenge him to fight. He then observed Nicholson approach from the

7.

driver's side of Smith's vehicle and put his gun in the door. As Smith rolled up the window and pushed the gun away, Nicholson fired, shattering the glass and striking Smith. Lawhorn testified that he did not see appellant at the time, but thought that he was behind Smith's vehicle.

{¶ 18} After the shot, Lawhorn, appellant, and Nicholson jumped in their car and fled. When they stopped briefly in an alley, Lawhorn asked what happened because he was surprised by the shot, and Nicholson said that he was trying to scare Smith and the gun accidentally fired. The trio then went their separate ways for the night. When they returned to the Buick Rendezvous the next day, no one wanted the car anymore, so Lawhorn decided to destroy it. He dumped gasoline all throughout the car, and then Nicholson set it on fire. The three then fled to Biloxi, Mississippi.

{¶ 19} While in Biloxi, Lawhorn learned that Smith had died as a result of the gunshot wound. Lawhorn, appellant, and Nicholson returned to Toledo on September 12, 2016, and the next day, Lawhorn turned himself in to the Toledo police. Lawhorn admitted that over the course of his conversations with the police he told a number of different versions of the story, but that he never identified anyone other than appellant and Nicholson as being involved.

{¶ 20} Thereafter, the state produced additional witnesses to testify as experts relative to cell phone records, the origin of the fire in the Buick Rendezvous, and the cause of death, in order to corroborate the version of events detailed by Garza and Lawhorn.

8.

{¶ 21} After the state rested, appellant moved for a Crim.R. 29 judgment of acquittal, which the trial court denied. Nicholson then took the stand in his own defense. Nicholson denied having any involvement in the shooting. He testified that he ran into Lawhorn on September 9, 2016, while he was walking his dogs. They had a short conversation, during which Nicholson told Lawhorn that he was travelling to Mississippi the next day to visit a friend. The two then parted, and Nicholson went back to walking his dogs. The next day, Lawhorn contacted Nicholson and asked if he could come to Mississippi as well. Nicholson agreed, and Lawhorn and appellant accompanied him to Mississippi. While in Mississippi, Nicholson learned about Smith's death, and came to believe that Lawhorn was involved. He then drove Lawhorn back to Toledo, and then distanced himself from Lawhorn.

{¶ 22} Following Nicholson's testimony, the defense rested. Appellant did not call any witnesses.

{¶ 23} Thereafter, the jury returned a verdict of not guilty on the count of aggravated murder, but guilty on the lesser-included-offense of murder in violation of R.C. 2903.02(A). The second count for felony murder was dismissed. The trial court then immediately sentenced appellant to serve 15 years to life in prison.

## II. Assignments of Error

{¶ 24} Appellant has timely appealed his judgment of conviction, and now asserts seven assignments of error for our review:

9.

1. The trial court erred when it refused to dismiss the jury upon the State's use of four strikes to strike all African-American jurors from the panel.

2. The trial court violated appellant's Sixth Amendment right to an impartial jury when it failed to remove the close relative of an eyewitness to the fatal shooting from the jury, entitling appellant to a new trial.

3. Defense counsel violated appellant's Sixth Amendment right to counsel by failing to remove the juror related to an eyewitness.

4. Appellant's conviction is against the manifest weight of the evidence, and appellant is entitled to a new trial.

5. The trial court's jury instructions regarding complicity constituted plain error.

6. Cumulative error deprived appellant of a fair trial.

7. The trial court abused its discretion when it ordered appellant, only in the judgment entry, to pay costs and appointed counsel fees, as appellant's lengthy sentence renders him unable to pay, the trial court made no finding of ability to pay at sentencing, and did not impose any costs or appointed counsel fees at sentencing.

### III. Analysis

### A. *Batson* Challenge

{¶ 25} In his first assignment of error, appellant relies on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to argue that the trial court committed

10.

structural error when it allowed the state to strike all four of the African-American members from the jury pool. In *Batson*, the United States Supreme Court held that in the state's exercise of its peremptory challenges, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89.

{¶ 26} Initially, we recognize that the *Batson* analysis does not apply to the first three African-American jurors that were stricken for cause. *See State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 158 (rejecting the defendant's argument that a for-cause challenge was racially motivated, reasoning that "*Batson* applies only to prospective jurors removed by peremptory challenge"). Thus, we are left with the fourth juror, on whom the state exercised a peremptory challenge.

{¶ 27} A *Batson* claim is adjudicated in three steps:

First, the defendant must make a prima facie case of racial discrimination. Second, if the defendant satisfies that burden, the prosecution must provide a racially neutral explanation for the challenge. Third, the trial court must decide, based on all the circumstances, whether the defendant has proved purposeful racial discrimination. At this stage, the court "must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." The judge must "assess the plausibility" of the prosecutor's reason for striking the juror "in light of all evidence with a bearing on it."

11.

(Internal citations omitted.)  *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 63.  "Appellate courts review *Batson* determinations with great deference. *Batson* judgments will be reversed only if found to be clearly erroneous."  *State v. Swain*, 6th Dist. Erie No. E-12-079, 2014-Ohio-1308, ¶ 23, citing *State v. Talley*, 6th Dist. Lucas No. L-07-1153, 2008-Ohio-6807, ¶ 19.

{¶ 28} Here, the state presented the racially neutral explanation that the challenged juror failed to disclose a prior conviction when asked.  Although defense counsel alleged that the state was only pulling the criminal records of African-American members of the jury pool, the state denied that allegation and offered that it had been pulling the records of almost all of the other jurors regardless of race, ethnicity, or national background. Ultimately, the trial court found that the challenge was not based on race, and accepted the state's racially neutral explanation.  Upon review, we cannot find that the trial court's decision was clearly erroneous.

{¶ 29} Accordingly, appellant's first assignment of error is not well-taken.

**B.  Juror Bias**

{¶ 30} In his second assignment of error, appellant argues that the trial court erred when it did not sua sponte dismiss the juror whose grandson had been married to A.T. We first note that appellant did not object at the trial, thus appellant has waived all but plain error.  *State v. Jennings*, 10th Dist. Franklin Nos. 09AP-70, 09AP-75, 2009-Ohio-6840, ¶ 30.  "Pursuant to the terms of Crim.R. 52(B), plain errors or defects which affect substantial rights may be grounds for reversal even though they were not brought to the attention of the trial court."  *State v. Davis*, 127 Ohio St.3d 268, 2010-Ohio-5706, 939

12.

N.E.2d 147, ¶ 24. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." (Internal quotations omitted.) *Id.*

{¶ 31} In support of his argument, appellant cites the standard in *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), that to obtain a new trial, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."

{¶ 32} As to the first prong, appellant contends that the juror did not honestly answer that she knew the victim when asked during voir dire. However, contrary to appellant's assertion, there is no indication in the record that the juror knew the victim in this case. Rather, the juror believed that the victim's girlfriend, A.T., had previously been married to her grandson. Notably, as to A.T., the juror also did not respond when the state asked if any of the jurors knew any of the state's witnesses, specifically mentioning A.T. by name. Nonetheless, we find that the record does not establish that the juror failed to honestly answer whether she knew the witness. While one could infer that the juror was intentionally misleading the court, we find that a more likely inference is that the juror simply did not recognize the name at the time. This inference is

13.

supported by the fact that the juror later voluntarily revealed the potential relationship to the court during the trial, and by the following exchange where the juror was not even certain whether her grandson had children with A.T.:

THE COURT: [Juror], at the end of the proceedings yesterday afternoon you brought to my clerk's attention that one of the witnesses may have been married to your grandson; is that correct?

[JUROR]: Yes.

THE COURT: The witness I think you're talking about is [A.T.]?

[JUROR]: Yes.

THE COURT: She was married to [M.T.]. Is that your grandson?

[JUROR]: Uh-huh.

THE COURT: And they may have had a child together, I understand.

[JUROR]: I don't know. I was told all four of them supposed to have been his, but I'm not for sure. I can't tell you that.

Therefore, we hold that appellant has not established that the juror failed to honestly answer a material question for a reason that affected the fairness of the trial.

{¶ 33} Furthermore, we hold that the record does not establish that a correct response would have constituted a valid basis for a challenge for cause. Appellant is entitled to impartial, indifferent jurors. *State v. Sheppard*, 84 Ohio St.3d 230, 235, 703 N.E.2d 286 (1998). "Yet jurors need not be totally ignorant of the facts and issues involved." *Id.* "The trial court has discretion in determining a juror's ability to be

14.

impartial," and "'[d]eference must be paid to the trial judge who sees and hears the juror." *Id.*, quoting *Wainwright v. Witt*, 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Although appellant frames this as a close family relationship, the record, as discussed above, does not support such a conclusion. Moreover, notwithstanding the fact that A.T. may have been married to the juror's grandson at one time, the juror indicated that she would be a fair and impartial juror. Similarly, the juror confirmed that her evaluation of the facts and circumstances would not change based on the potential that one or more of her great-grandchildren may have been in the car at the time of the shooting. Given the juror's tenuous relationship with A.T., and the deference given to the trial court to determine whether the juror could be fair and impartial, we hold that the trial court did not commit plain error when it did not sua sponte remove the juror.

Accordingly, appellant's second assignment of error is not well-taken.

### C. Ineffective Assistance

{¶ 34} In his third assignment of error, appellant argues that his trial counsel was ineffective for failing to object to the juror who knew A.T.

{¶ 35} To prevail on a claim of ineffective assistance of counsel, appellant must satisfy the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That is, appellant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different. *Id.* at 687-688, 694. "When a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the

15.

defendant '*must* show that the juror was *actually biased* against him.'" (Emphasis sic.) *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 67, quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir.2001).

{¶ 36} Appellant contends that no reasonable person would allow a juror to serve who was directly related to the witness, or would believe that the great-grandmother of a child would be impartial about a homicide that occurred within mere feet of that child. Appellant overstates the juror's relationship to this incident. Far from a direct relationship, A.T. is the juror's grandson's ex-wife, and the juror was even uncertain whether her grandson had any children with A.T. Thus, it is pure speculation that her great-grandchildren were in the car when Smith was shot. Because the record does not establish that the juror had a close relationship to the facts or witnesses in this case, we hold that appellant has not shown that the juror was actually biased against him. Consequently, we hold that appellant has not demonstrated a reasonable probability that but for counsel's failure to object the result of the proceedings would have been different.

{¶ 37} In addition, we hold that appellant has not overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689. In so holding, we rely on the fact that trial counsel was able to see and hear the juror, and thus was in a better position to judge her ability to be impartial. Furthermore, we find that the reasonableness of counsel's decision not to object is supported by the trial court's and Nicholson's counsel's similar decision to allow her to serve.

16.

**{¶ 38}** Accordingly, because appellant has failed to satisfy both prongs of the *Strickland* test, his claim of ineffective assistance of counsel must fail.

**{¶ 39}** Appellant's third assignment of error is not well-taken.

### D. Manifest Weight

**{¶ 40}** In his fourth assignment of error, appellant argues that his conviction is against the manifest weight of the evidence. When reviewing a manifest weight claim,

> [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶ 41}** To prove appellant guilty of murder in violation of R.C. 2903.02(A), the state must show that appellant "purposely cause[d] the death of another." "A person acts purposely when it is the person's specific intention to cause a certain result * * *." R.C. 2901.22(A). Because appellant did not actually pull the trigger and shoot Smith, the jury was instructed on complicity under R.C. 2923.03(A), which provides, "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) Aid or abet another in committing the offense." "To support a

17.

conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus.

{¶ 42} Appellant argues that Garza's testimony should not be believed, and he points out that despite her various stories to the police, it was not until after she was indicted that Garza mentioned that appellant had said that he was going to kill Smith. In addition, appellant argues that Garza's comparatively close relationship with Lawhorn, and Lawhorn's conduct during and after the shooting, make it more likely that Garza called Lawhorn, not appellant, to report that Smith was at the 7-Eleven. Appellant concludes that without Garza's testimony, no other evidence exists that appellant "supported, assisted, encouraged, cooperated with, advised, or incited" Nicholson and Lawhorn to shoot Smith. We disagree.

{¶ 43} As to appellant's contention that it is more likely that Garza called Lawhorn than appellant, such a position is directly refuted by the cell phone records which show two calls between Garza and appellant at the same times as depicted in the 7-Eleven security video shortly before the shooting. The existence of these phone calls lends credibility to Garza's testimony that appellant directed her to call him if she saw Smith, and provides evidence that appellant aided and abetted Lawhorn and Nicholson in the shooting of Smith. In particular, the evidence reveals that appellant directed Garza to

18.

call him if she saw Smith. On September 9, 2016, appellant received such a call from Garza, informing him that Smith was at the 7-Eleven. Appellant then yelled for Lawhorn to get back in the Buick Rendezvous, and they drove to the location at a high rate of speed. Once they arrived at the 7-Eleven, appellant got out of the car with Lawhorn and Nicholson, and approached Smith. After Nicholson shot Smith, appellant then got back in the car with Nicholson and Lawhorn and fled the scene. The three met again the next day and destroyed the Buick Rendezvous. They then fled together to Biloxi, Mississippi. Thus, the evidence shows that appellant supported, assisted, encouraged, and cooperated with Nicholson and Lawhorn in shooting Smith.

{¶ 44} Turning to whether appellant shared the purpose to kill Smith, such intent can be shown by Garza's testimony that appellant said he was going to kill Smith. Appellant's intent can also be inferred from the manner in which the shooting occurred. Immediately upon receiving the call that Smith was at the 7-Eleven, appellant, Lawhorn, and Nicholson rushed over there. Appellant then got out of the car behind Nicholson, who exited with a gun in his hand and his face covered. The shooting itself occurred within seconds, with no hesitation. After the shooting, appellant walked a few paces around the parking lot, and then got back into the car along with Lawhorn and Nicholson. From this evidence, we find that it is reasonable to conclude that appellant went to the 7-Eleven with the purpose to shoot Smith.

{¶ 45} Therefore, upon our review and weighing of the evidence and all reasonable inferences, we hold that this is not the exceptional case where the jury clearly

19.

lost its way and created a manifest miscarriage of justice when it found appellant guilty of murder in violation of R.C. 2903.02(A).

{¶ 46} Accordingly, appellant's fourth assignment of error is not well-taken.

### E. Jury Instructions

{¶ 47} For his fifth assignment of error, appellant presents two instances in which he argues that the trial court's jury instructions were insufficient. Because appellant did not object to the jury instructions at the time of trial, we review the instructions for plain error. *State v. Underwood*, 3 Ohio St.3d 12, 13, 444 N.E.2d 1332 (1983) ("Absent plain error, the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal."). We find that in both cases, the trial court properly instructed the jury.

{¶ 48} First, appellant argues that the trial court's instruction on accomplice testimony was insufficient. R.C. 2923.03(D) provides:

If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

"The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his

20.

testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

{¶ 49} Here, the trial court instructed the jurors:

You have heard the testimony from Demarcus Lawhorn and Jacquelen Garza, other persons who have pleaded guilty to a crime charged in this case and are said to be accomplices. An accomplice is one who purposely or knowingly assists, joins another in the commission of a crime. Whether Demarcus Lawhorn and Jacquelen Garza were accomplices and the weight to be given to their testimony are matters for you to determine. Testimony of a person who you find to be an accomplice should be viewed with grave suspicion and weighed with great caution.

{¶ 50} "The legislative purpose of R.C. 2923.03(D) is to alert juries of the potentially self-serving motivation behind an accomplice's testimony in a strong and uniform manner." *State v. Woodson*, 10th Dist. Franklin No. 03AP-736, 2004-Ohio-5713, ¶ 17, citing *State v. Ramsey*, 8th Dist. Cuyahoga No. 83026, 2004-Ohio-3618, ¶ 49. In this case, the trial court's instruction informs the jurors that Lawhorn and Garza are accomplices. It directs the jurors that the weight to be given to their testimony is a matter for the jurors to determine. Finally, it warns the jurors that accomplice testimony should be viewed with "grave suspicion" and "weighed with great caution." Thus, we hold that

21.

the trial court's instruction substantially complies with R.C. 2923.03(D). *See State v. Sutton*, 10th Dist. Franklin No. 06AP-708, 2007-Ohio-3792, ¶ 61 ("[A] trial court substantially complies with R.C. 2923.03(D) by alerting the jury that accomplice testimony should be viewed with 'grave suspicion' and 'weighed with great caution.'").

{¶ 51} In the second instance, appellant argues that the trial court's instructions regarding "aid and abet" should have included an instruction that "mere presence is not enough."

{¶ 52} "A court's jury instructions should contain plain, unambiguous statements of the law, which are applicable to the case and evidence presented to the jury." *State v. Hernandez*, 6th Dist. Lucas Nos. L-06-1388, L-06-1389, 2009-Ohio-386, ¶ 75. "The jury instructions provided by the trial court must be confined to the issues raised by the pleadings and the evidence." *Id.*

{¶ 53} Here, the evidence demonstrates that appellant was not merely present at the scene. He received the call that took the trio to the 7-Eleven, moved in conjunction with Nicholson and Lawhorn as Nicholson shot Smith, and then retreated to the car with them. Thus, a jury instruction on mere presence was not appropriate. *See State v. Allen*, 6th Dist. Wood No. WD-16-058, 2018-Ohio-887, ¶ 40 (mere presence instruction not appropriate where evidence showed the defendant was participating with the other occupants of the car in the trafficking and possession of drugs); *State v. Perkins*, 8th Dist. Cuyahoga No. 83659, 2004-Ohio-4915, ¶ 47-51 ("mere presence" instruction not warranted where the evidence does not support the same).

{¶ 54} Accordingly, appellant's fifth assignment of error is not well-taken.

22.

## F. Cumulative Error

{¶ 55} In his sixth assignment of error, appellant argues that cumulative error deprived him of a fair trial. Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. However, where, as here, there are not multiple instances of harmless error, the cumulative error doctrine does not apply. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

{¶ 56} Accordingly, appellant's sixth assignment of error is not well-taken.

## G. Costs of Confinement and Appointed Counsel

{¶ 57} Finally, in his seventh assignment of error, appellant argues that the trial court erred when it ordered him to pay the costs of supervision, confinement, and appointed counsel. During sentencing, the trial court did not discuss the matter of costs. Nonetheless, in its sentencing entry, the trial court stated, "Defendant found to have, or reasonably may be expected to have, the means to pay all or part of the applicable costs of supervision, confinement, assigned counsel, and prosecution as authorized by law."

{¶ 58} We review felony sentences under the approach set forth in R.C. 2953.08(G)(2). *State v. Tammerine*, 6th Dist. Lucas No. L-13-1081, 2014-Ohio-425, ¶ 11. R.C. 2953.08(G)(2) provides that an appellate court "may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the

23.

sentence and remand the matter to the sentencing court for resentencing * * * * if it clearly and convincingly finds: * * * (b) That the sentence is otherwise contrary to law."

{¶ 59} Unlike the costs of prosecution, imposition of the costs of appointed counsel and confinement must be conditioned upon appellant's ability to pay. *State v. Seals*, 6th Dist. Lucas No. L-17-1177, 2018-Ohio-2028, ¶ 14. Specifically, R.C. 2941.51(D) provides, "[I]f the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay." Likewise, R.C. 2929.18(A)(5)(a)(ii) authorizes as a financial sanction, "All or part of the costs of confinement * * * provided that the amount of reimbursement ordered under this division shall not exceed the total amount of reimbursement the offender is able to pay as determined at a hearing and shall not exceed the actual cost of the confinement." We have held that although a formal hearing is not required, "the court must enter a finding that the offender has the ability to pay and that determination must be supported by clear and convincing evidence of record." *State v. Maloy*, 6th Dist. Lucas No. L-10-1350, 2011-Ohio-6919, ¶ 14, citing *State v. Jobe*, 6th Dist. Lucas No. L-07-1413, 2009-Ohio-4066, ¶ 80.

{¶ 60} Here, the trial court did not make a determination during the sentencing hearing regarding appellant's ability to pay. Further, nothing in the record supports such a determination, as there was no evidence of appellant's assets, education, or employment history, and appellant has been sentenced to a term of eighteen years to life in prison. Therefore, we hold that the trial court's imposition of the costs of supervision,

24.

confinement, and appointed counsel is contrary to law. *See State v. Wymer*, 6th Dist. Lucas No. L-18-1108, 2019-Ohio-1563, ¶ 15 (trial court erred in imposing costs of confinement and appointed counsel where appellant had been in prison for 16 years, had another eight years to life to serve, and there was nothing in the record to demonstrate his level of education or employment history).

{¶ 61} Accordingly, appellant's seventh assignment of error is well-taken.

### IV. Conclusion

{¶ 62} For the foregoing reasons, we find that substantial justice has not been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed, in part, and reversed, in part. The portion of the trial court's sentencing order requiring appellant to pay the "applicable costs of supervision, confinement, [and] assigned counsel" is vacated. The remainder of the sentencing order is affirmed. The parties are ordered to evenly share the costs of this appeal pursuant to App.R. 24(A).

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.
                                      _____
                                              JUDGE
Thomas J. Osowik, J.

Christine E. Mayle, J.
                                      _____
CONCUR.
                                              JUDGE

                                      _____
                                              JUDGE

25.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.