# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

BENNIE ADAMS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 18 MA 0116**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2007 CR 1261

**BEFORE:**
Gene Donofrio, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul Gains*, Prosecuting Attorney, *Atty. Ralph Rivera,* Assistant Prosecutor, Mahoning County Prosecutor's Office, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee, and

*Atty. Kimberly Rigby*, Office of the Ohio Public Defender, 250 E. Broad Street, Suite 1400, Columbus, Ohio 43215, for Defendant-Appellant..

Dated:
September 30, 2019

**Donofrio, J.**

{¶1}    Defendant-appellant, Bennie Adams, appeals from a Mahoning County Common Pleas Court judgment denying his postconviction petition.

{¶2}    The Ohio Supreme Court set out the facts and procedural history of this case:

The Burglary and the Murder

In the autumn of 1985, Gina Tenney was a sophomore at Youngstown State University. She lived alone in a second-floor apartment in a converted house on Ohio Avenue in Youngstown.

Adams lived in the same house in a downstairs apartment with his girlfriend, Adena Fedelia. The duplex had an interior common staircase.

Around 1:00 a.m. on December 25, 1985, Tenney was getting ready for bed when, as she told a friend, she "heard someone at the door with the keys like they were trying to get in." Tenney called her ex-boyfriend, Mark Passarello, who came and stayed with her until about 3:00 a.m. on Christmas morning.

Shortly after Passarello left, Tenney again heard someone at her door. The person knocked over the chair Tenney had placed against the door and entered the apartment. Tenney called the police to report an intruder in her apartment. The responding police officers found footprints in the snow leading from her apartment to 275 West Dennick Avenue in Youngstown.

The investigation was assigned to Detective William Blanchard of the Youngstown Police Department. On December 26, 1985, Blanchard met

with Tenney at her apartment. Looking at her apartment door, Blanchard saw "slight" but "noticeable" evidence of a forced entry.

Blanchard followed up on the report of footprints by traveling to 275 West Dennick and interviewing a resident there, Ed Tragesser. Tragesser claimed to know nothing about the break-in. Blanchard testified that Tragesser was never ruled out as the burglar but that there was no evidence to sustain charging him with any crime. Blanchard, however, suspected that Adams may have been the burglar based on what Tenney had told him.

Tenney's friend, Penny Sergeff, also suspected that Adams was the burglar.

According to Sergeff, the outside door to Tenney's building made a loud screeching noise when it was opened or closed. But Tenney had not heard the door screech the night of the burglary, which suggested to Sergeff that the burglar had not come from outside the apartment building. Sergeff shared the information about the screeching door with the police, but never explicitly communicated her suspicions about Adams at the time she initially spoke to the police.

Less than a week after the break-in, on the morning of December 30, 1985, Tenney's dead body was discovered in the Mahoning River. Upon identifying Tenney's body, homicide detectives called Blanchard into the investigation.

### The Investigation and Arrest of Adams

From the outset, Blanchard considered Adams a person of interest in the homicide.

Blanchard and two homicide detectives traveled to the duplex on Ohio Avenue. They knocked on the exterior door for "a number of minutes" until Adams emerged from his apartment and admitted them into the common area.

Upstairs, the police officers found the door to Tenney's apartment locked. They observed no blood on the steps. Blanchard saw no new evidence of forced entry.

The investigators decided to call the building's owner for the key to Tenney's apartment. They then knocked on Adams's apartment door for permission to use his telephone; Adams let them in.

While one detective placed the call, Blanchard and Lieutenant David Campana talked to Adams, asking him when he had last seen Tenney, whether anything suspicious had been happening lately, whether anybody else was around who might know something, and whether he was alone. Adams indicated that he was alone in the apartment and told detectives that he did not know where Tenney might be.

Just then, the detectives heard a loud bump, a sound like a door hitting a wall. Adams then said, "I never said he wasn't here" or words to that effect. Blanchard and Campana went into a back bedroom, where they found Horace Landers hiding behind a door.

Campana recognized Landers and remembered that there was an outstanding misdemeanor warrant for him. Campana and Blanchard immediately arrested Landers and handcuffed him.

Landers was wearing trousers, but was bare-chested. Knowing that they would have to take him outside into the cold, Blanchard looked around and saw a shirt on the bed, which he draped over Landers's shoulders. But Blanchard thought that he should put something else on Landers. He saw a jacket on the floor three or four feet away, just outside the door to the bedroom where they had found Landers.

As Blanchard searched the jacket for weapons, Landers told him that the jacket belonged to Adams. Simultaneously, Blanchard felt a hard object in the pocket and pulled it out. The object was an ATM card from Dollar

Bank bearing the name Gina Tenney. Blanchard testified that he also found a folded Mahoning County welfare card in the name of Bennie Adams in the pocket.

The police officers immediately arrested Adams. When they searched him, they found a blue tissue in his pants pocket with two cigarette butts wrapped up in it.

Fedelia, whose name was on the lease, consented to a search of the apartment she shared with Adams. In a bathroom wastepaper basket, police officers found a ring of ten keys with the letter G on the keychain. One of the keys fit Tenney's apartment door and another key fit her automobile.

In the kitchen, Blanchard found a potholder with hair and dirt on it in a wastebasket. Police officers later found a matching potholder atop the refrigerator in Tenney's apartment.

Police officers also found an unplugged television on a bed in Adams's apartment. The serial number on the television matched the number on an empty television box later discovered in Tenney's apartment. A wall unit in Tenney's apartment contained an empty space for a television, and a cable-television line dangled in the space.

In Tenney's apartment, Blanchard saw no broken glass, broken furniture, or other indication that the home had been ransacked. A plate of food and a beer bottle were on the kitchen table. At trial, Blanchard claimed a "vague recollection" of "some disarray," but he could not recall what he had observed. His contemporaneous investigative notes did not mention disarray or overturned furniture.

Tenney's friends told police investigators that Adams had been bothering Tenney for some time before her death. Sergeff and Marvin Robinson, another one of Tenney's friends, testified that when they visited

Tenney, Adams often stood in his doorway watching them or peeked out through the curtains. According to Robinson and Sergeff, Adams started calling Tenney late at night, asking her to invite him up to her apartment. The calls continued even after Tenney asked him to stop, and Tenney eventually changed her telephone number.

Robinson also described an incident in which someone slipped a card in an envelope under Tenney's back door addressed "to a very sweet and confused young lady" and signed "love, Bennie." Police officers found the envelope in Tenney's apartment but did not find the card.

According to her friends, after the Christmas break-in Tenney's emotional state changed from frustration with Adams to fear of him. For the next few nights, she asked a friend to stay over because she was afraid to be alone. Sergeff testified that Tenney specifically had said that she was afraid of Adams, a detail Sergeff did not include in her police statement given shortly after Tenney's death.

At trial, Tenney's friends described their interactions with her during the last two days of her life. Sergeff and Tenney spent the evening of December 28, 1985, watching television in Tenney's apartment. At some point, Passarello, Tenney's ex-boyfriend, came over, and Sergeff asked him to drive her home. Passarello then returned to Tenney's apartment. Passarello testified that Tenney did not feel secure in the apartment. He stayed the night, and the two had sexual relations.

Passarello left the next day after lunch and went home to his apartment. Tenney left separately at the same time to meet a friend, Jeff Thomas, for an early afternoon movie.

After the movie, Thomas and Tenney had dinner near the theater. Thomas testified that they talked about work and school, but Tenney kept bringing the conversation back to "the situation that was going on where she was living." She told Thomas that she was very concerned about "the

man downstairs." Thomas described her as "apprehensive" and "borderline fearful." Thomas and Tenney parted around 4:30 or 5:00 p.m.

Tenney's mother, Avalon Tenney, testified that her daughter had called her the day before she died and told her that she was afraid of Adams.

<u>The Identification of Adams</u>

As part of the homicide investigation, detectives obtained Tenney's bank-account records from Dollar Bank. Her account records for December 29, 1985, showed six attempted transactions on her ATM card between 9:24 and 9:34 p.m.: three attempts to withdraw cash (all denied for insufficient funds), two phony attempted deposits using empty deposit envelopes, and an unsuccessful attempt to transfer funds between accounts.

Police officers questioned other bank customers whose ATM cards were used at the same ATM machine around the same time as the attempted transactions using Tenney's card. One customer, John Allie, told police officers that he saw a man at the ATM on the night in question.

On January 8, 1986, Blanchard brought John Allie and his wife, Sandra Allie, who had also seen the man use the ATM, to the station to view an in-person lineup. There were six men in the lineup, including Adams and Landers. John Allie did not make an identification; Sandra Allie identified Landers as the man she saw at the ATM.

At trial, John Allie testified that he had not identified anyone in the lineup because he was not comfortable with the number of people in the room. He also testified, "I told my wife, don't say anything because we need to talk to detective Blanchard. Don't mention nothing to nobody."

John Allie told the jury that he later telephoned Blanchard and said that the man from the ATM was third from the left, which was the place

where Adams had stood in the lineup. John claimed that he returned to the police station the next day, met with Blanchard, viewed a photo array of three pictures, and made an identification of Adams.

Sandra Allie testified at trial that she purposely made a false identification at the lineup. She testified that on the way to the station that day, John had expressed concern about putting her "in harm's way." When they arrived, they were taken to an office with other people present and not to the dark room that Sandra had been expecting. John then told her that "he didn't like the surroundings." "He gave me like the signal," Sandra testified. "When asked if I could identify the person who was in the ATM I was just terrified, went to the extreme opposite and identified a short, light-skinned person."

Like her husband, Sandra Allie testified that she spoke to police officers sometime after the lineup to identify "the actual person," but said that the police officers did not request a statement about her misidentification at the first lineup or call her back to view a second lineup.

At trial, the Allies both said that when they arrived at the bank that night, they saw a man in the ATM vestibule who appeared not to know how to use the ATM. The man's face was covered by a hood and scarf, so that only his forehead, eyes, and the bridge of his nose were visible.

Sandra Allie described the man as a little taller than she is. John Allie agreed that the man was "about medium height."

At trial, Sandra Allie viewed a photograph of the six-man lineup and testified that person Number 3 (Adams) was the man at the ATM. John Allie also identified Adams.

John Allie testified that when the man came out of the ATM vestibule, he stood in front of the Allies' car and waved: "He put his hands—palms on the hood of my car and stood back, looked at me. I looked at him. He waved.

I waved." John recognized Adams from seeing him around the neighborhood, even though he did not know Adams's name at the time.

When the man started the car he was driving, John Allie heard it make an unusual sound. John testified that the vehicle was a Buick and identified it from photographs as Tenney's car. When John came to the police station, he correctly picked out Tenney's car from the 15 or 20 he was shown. An officer started the engine, and the car made the same sound that John had heard it make at the bank.

### The Parole Officer's Interviews with Adams

Adams's former parole officer, William Soccorsy, testified that he interviewed Adams twice after his 1985 arrest. The first time they spoke, on December 30, 1985, Adams denied committing any crime and denied having any knowledge that any crime had been committed.

On January 2, 1986, Soccorsy asked Adams about the ATM card. According to Soccorsy, Adams admitted that the jacket in which the card was found belonged to him. Soccorsy's contemporaneous notes included a statement by Adams to the effect that he found the ATM card outside his building on the front step at around 11:30 a.m. on December 30, 1985. Adams told Soccorsy that he rang Tenney's doorbell to return the card but she was not home, so he put the card in his jacket pocket, intending to return it at some later time.

### The Autopsy of Tenney

On December 31, 1985, an autopsy of Tenney's body was performed under the supervision of Mahoning County Coroner Nathan D. Belinky, M.D.

Dr. Belinky reported finding "ligature type contusion(s)" on the neck, as well as "doubletrack ligature type contusions" around both wrists. There were additional contusions and/or abrasions on both wrists, the abdomen

and chest, both breasts, and around the nose, lips, and chin. There was blood coming from the right nostril. Dr. Belinky concluded that the cause of death was "traumatic asphyxiation," and he ruled the death a homicide.

Dr. Belinky was deceased when the case first came to trial in 2008, and the state called Dr. Humphrey Germaniuk as its expert forensic pathologist.

Dr. Germaniuk testified that he reviewed Dr. Belinky's autopsy report and the death certificate, as well as the videotape of the autopsy and photographs of the body and the scene. The photographs showed a bruise or contusion on the upper part of Tenney's right lip and abrasions or contusions on her chin, a faint ligature mark on Tenney's neck (which Dr. Germaniuk described as "superficial"), and ligature marks on her left and right wrists.

Dr. Germaniuk ruled out drowning as a cause of death based on the absence of a "foam cone" around Tenney's mouth. He concluded that the cause of death was asphyxia and the manner of death was homicide. But Dr. Germaniuk took issue with the phrase "traumatic asphyxiation" in the autopsy report, which he characterized as "somewhat inexact, somewhat incorrect." He would have described the cause of death as "asphyxia," which simply means lack of oxygen.

Dr. Germaniuk observed a bruise or contusion on the upper part of Tenney's right lip and abrasions or contusions on her chin. Although Dr. Germaniuk testified that the marks were consistent with smothering by means of a hand or object placed over her face, he also testified that the marks could have been caused by someone hitting her in the face. Dr. Germaniuk said that the evidence of smothering was not significant enough for him to declare that the cause of death with any reasonable medical certainty.

Case No. 18 MA 0116

Likewise, Dr. Germaniuk testified that there was evidence of ligature strangulation, including petechial hemorrhaging, but the ligature marks did not break the skin. The injuries could have been caused by strangulation or by being tied up, but Dr. Germaniuk could not say that ligature strangulation caused Tenney's death. Dr. Germaniuk testified that the cause of death was "probably" some combination of smothering and/or ligature strangulation. Ultimately, Dr. Germaniuk was unable to opine as to a cause of death that was more specific than asphyxia.

The autopsy report listed the time of death as 11:15 p.m. on December 29, based on a test of Tenney's vitreous potassium. But according to Dr. Germaniuk, vitreous potassium is an inaccurate indicator of time of death and even in 1985, only the "uninformed" would have used vitreous potassium to determine time of death. Dr. Germaniuk explained that most other tests for time of death could not have been employed, because Tenney's body had been found in the frigid waters of the Mahoning River. And though the time of death could possibly have been determined based on gastric emptying, i.e., by measuring the contents of the stomach, in order to make a reasonable calculation one has to know the time of the victim's last meal. Assuming that Tenney last ate around 4:00 or 4:30 p.m. (when she and Thomas had dinner after the movie), Dr. Germaniuk estimated the time of death as between 5:00 and 10:30 p.m. But if Tenney had eaten later, his estimate of her time of death would have been different.

The prosecution in questioning Dr. Germaniuk noted several times that police officers had found a telephone type of cord in the trunk of Tenney's car. The cord was one-half centimeter wide and had no weaving pattern. The ligature marks were also one-half centimeter wide and showed no weave pattern. According to Dr. Germaniuk, the cord could have been used to make the ligature marks on Tenney's neck and wrists, but because the cord was not different from thousands of other cords, he was unable to definitively say that the cord in the trunk was used on Tenney.

Dr. Germaniuk testified that the autopsy team did not examine the body for signs of sexual trauma or assault.

## DNA and Fingerprint Evidence

When Adams was arrested in late 1985, police officers obtained samples of his pubic hair, saliva, and blood. Samples were also obtained from Landers, Passarello, and Tenney, and semen was found on a vaginal swab taken from Tenney. The samples from Adams, Landers, and Passarello were compared to the samples taken from Tenney.

The semen on the swab came from a "type B nonsecretor." Passarello is a type A secretor, and Landers was a type B secretor. Thus, blood testing in 1986 eliminated Passarello and Landers as the semen source.

Adams, however, is a type B nonsecretor. Four percent of African-Americans are type B nonsecretors. Thus, the blood evidence at that time did not definitively prove that Adams, an African-American, was the source of the vaginal semen, but it placed him within the population of possible sources.

The potholder in Adams's apartment contained hair from an African–American and from a Caucasian with red hair, as well as pubic hair. Gina Tenney was Caucasian and had red hair. The red hair and pubic hair were consistent with Tenney's. The sample of African–American hair was small fragments and was not sufficient for comparison purposes.

Police officers found fingerprints of evidentiary value only on the television that was in Adams's apartment. Investigators were able to lift nine usable prints from the television. Four prints matched Adams's. The other five could not be matched to Tenney, Adams, or Landers.

Despite the suspicions that Adams may have been involved in Tenney's death, the investigation into Tenney's death went cold in 1986. In

January 1986, Adams was charged with one count of receiving stolen property based on the discovery of Tenney's ATM card in his jacket pocket. The grand jury, however, later declined to indict Adams on the stolen-property charge.

Police officers kept Adams in custody because he was a suspect in a rape that had occurred in nearby Boardman, Ohio. In November 1986, Adams was convicted in Mahoning County Common Pleas Court of kidnapping, rape, and aggravated robbery in that case. He served almost 18 years in prison, and he was released on parole on April 21, 2004.

The Investigation Resumes

In 2007, more than 20 years after Tenney's death, the Ohio attorney general invited police departments to submit cold-case evidence to the Ohio Bureau of Criminal Identification and Investigation ("BCI") laboratory for DNA testing. The Youngstown police department submitted evidence from the Tenney case.

The police department submitted Tenney's underwear and vaginal swab for DNA testing and submitted a fresh DNA sample from Passarello. Because Tenney and Landers were both deceased, the department forwarded samples from 1986 that were still on file. Police officers also took a fresh DNA sample from Adams and submitted that to BCI.

Based on the DNA analysis, Adams could not be excluded as the source of the DNA on the vaginal swab or the underwear. The odds that the DNA on the swab came from someone other than Adams were 1 in 38,730,000,000,000. The odds that the DNA on the underwear came from someone other than Adams were 1 in 63,490,000,000,000,000,000.

DNA analysis excluded Landers as the source of the DNA on the swab and the underwear.

Case No. 18 MA 0116

Passarello's DNA was found on Tenney's underwear, but his DNA was not found in the vaginal-semen sample.

Procedural History

Almost three and one-half years after he was released on parole for the Boardman rape and related convictions, police officers arrested Adams and charged him with aggravated murder in connection with Tenney's 1985 death.

On October 11, 2007, a grand jury returned a five-count indictment that was later superseded by an indictment returned on October 17, 2007. Count One charged Adams with aggravated felony murder (R.C. 2903.01(B)) with a single death-penalty specification, that Tenney's murder was committed in the course of or immediately after committing or attempting to commit rape, aggravated burglary, aggravated robbery, and kidnapping. R.C. 2929.04(A)(7). Count Two charged Adams with rape (R.C. 2907.02(A)(2)), with a violent-sexual-predator specification under R.C. 2941.148(A). The remaining counts of the indictment set forth charges for aggravated burglary (R.C. 2911.11(A)), aggravated robbery (R.C. 2911.01(A)), and kidnapping (R.C. 2905.01(A)).

The trial court dismissed all counts but the aggravated-murder charge on statute-of-limitations grounds, and the case proceeded to trial. After hearing the evidence, the jury returned a guilty verdict on the aggravated-murder charge and the accompanying capital specification.

Following the presentation of mitigation evidence, the jury returned a recommendation of death. The trial court adopted the jury's recommendation and sentenced Adams to death.

(Footnotes omitted); *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 3-73.

Case No. 18 MA 0116

{¶3} Appellant appealed. This court affirmed his conviction and death sentence. *State v. Adams*, 7th Dist. Mahoning No. 08 MA 246, 2011-Ohio-5361, aff'd in part, vacated in part, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127. The Ohio Supreme Court affirmed the conviction. *Adams*, 144 Ohio St.3d 429. But it vacated the death sentence. *Id.* It remanded the matter to the trial court for resentencing.

{¶4} While appellant's appeal was pending in the Supreme Court, he filed an application to reopen his direct appeal in this court, which we denied. *State v. Adams*, 7th Dist. Mahoning No. 08 MA 246, 2012-Ohio-2719, ¶ 1. The Ohio Supreme Court affirmed that judgment. *State v. Adams*, 146 Ohio St.3d 232, 2016-Ohio-3043, 54 N.E.3d 1227.

{¶5} On June 6, 2016, on remand from the Ohio Supreme Court, the trial court sentenced appellant to 20 years to life.

{¶6} Appellant next filed a postconviction petition on June 5, 2017. He raised ten grounds for relief.

{¶7} The state filed a motion for summary judgment on appellant's petition. The trial court granted the state's motion. The trial court found four of appellant's grounds for relief were barred by the doctrine of res judicata. The court overruled the remaining six grounds for relief and denied appellant's petition.

{¶8} Appellant filed a timely notice of appeal on October 25, 2018. He now raises three assignments of error. We will address appellant's second assignment of error first for ease of discussion.

{¶9} Appellant's second assignment of error states:

THE TRIAL COURT ERRED IN APPLYING THE DOCTRINE OF RES JUDICATA TO BAR ADAMS' POST-CONVICTION CLAIMS.

{¶10} The trial court dismissed several portions of appellant's postconviction petition based on the doctrine of res judicata. Specifically, the trial court found appellant's first, second, third, and eighth grounds for relief were, or could have been, raised on direct appeal.

{¶11} Appellant points out that res judicata does not apply if a postconviction petition is supported by evidence de hors the record. He asserts that he supported each

of the four grounds for relief noted above with evidence outside of the record. Additionally, he asserts that grounds two and three were based on the theory of ineffective assistance of counsel, which in this case depended on matters outside of the record.

**{¶12}** The doctrine of res judicata provides that any issue that was or could have been raised on direct appeal is barred in later proceedings and is not subject to review. *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, ¶ 16.

**{¶13}** Appellant's first ground for relief alleged the trial court should not have admitted the autopsy report or allowed Dr. Germaniuk to testify regarding the autopsy report because the report and testimony violated appellant's right to confrontation. Appellant acknowledged that the county coroner who signed the autopsy report was deceased. But he argued that Dr. Rona, the doctor who actually performed the autopsy, was alive and could have testified even though he had no memory of performing the autopsy. Appellant argued that his constitutional right to confront witnesses against him was violated because he was denied the opportunity to cross examine Dr. Rona. Appellant further argued that Dr. Germaniuk should not have been permitted to offer his opinion regarding the autopsy results. He notes that the trial court ruled that Dr. Germaniuk could testify but was only to present the autopsy findings made in 1985 without testifying as to his own conclusions. Yet Dr. Germaniuk offered several of his own opinions. Appellant also argued that the trial court should not have admitted the autopsy report since he was never given the chance to cross examine its preparer.

**{¶14}** The issue surrounding the admission of the autopsy report and Dr. Germaniuk's testimony was contained wholly within the trial court record. Therefore, appellant should have, and failed to, raise this issue in his direct appeal. On this ground, the trial court properly applied the doctrine of res judicata to dismiss this portion of appellant's postconviction petition.

**{¶15}** Moreover, the Ohio Supreme Court addressed this exact issue in affirming our denial of appellant's application to reopen his direct appeal.

> In his first proposition of law, Adams argues that the admission of the coroner's report without the testimony of the doctor who prepared the report violated his rights under the Confrontation Clause of the Sixth

Amendment and that his appellate counsel were ineffective for failing to raise this issue on direct appeal. * * *

At the time this App.R. 26(B) application was briefed, the law surrounding the admissibility of autopsy reports prepared by nontestifying medical examiners was unsettled. However, we have since held that "an autopsy report that is neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of providing evidence in a criminal trial is nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 63.

Adams argues that the state could have called the coroner who had performed the autopsy but chose not to do so. Even assuming this is true, the availability of the original coroner is irrelevant. Evid.R. 803, which contains the business-records exception to the hearsay rule, expressly states that evidence within the scope of the rule is admissible "even though the declarant is available as a witness."

Alternatively, Adams argues that it was a Confrontation Clause violation to allow Germaniuk to testify as to the contents of the report or to offer his own opinions. *Maxwell* resolved these issues as well. Because the report is itself admissible, Germaniuk's testimony as to its contents is not a Confrontation Clause problem. *Maxwell*, ¶ 51–52. With respect to Germaniuk's testifying as to his own opinions, "[s]uch testimony constituted [his] original observations and opinions and did not violate the Confrontation Clause, because he was available for cross-examination regarding them." *Id*. at ¶ 53.

Based on *Maxwell*, we hold that the failure to challenge Germaniuk's testimony or the autopsy report was not ineffective representation, because any such challenge would have failed as a matter of law.

*Adams*, 146 Ohio St.3d 232, at ¶ 3-7.

**{¶16}** Thus, the Ohio Supreme Court has already ruled on this issue.

**{¶17}** Appellant's second and third grounds for relief raised ineffective assistance of trial counsel. Generally, a claim of ineffective assistance of trial counsel should be raised in a direct appeal. *State v. Dillard*, 7th Dist. Jefferson No. 12 JE 29, 2014-Ohio-439, ¶ 21, 27; *State v. Delgado*, 7th Dist. Mahoning No. 15 MA 26, 2015-Ohio-5006, ¶ 18. A trial court properly dismisses a petition for postconviction relief based on res judicata "when the defendant, represented by new counsel on direct appeal, fails to raise therein the issue of competent trial counsel and the issue could fairly have been determined without resort to evidence outside the record." *State v. Carosiello*, 7th Dist. Columbiana No. 18 CO 0018, 2019-Ohio-2705, ¶ 28, quoting *State v. Sturgill*, 12th Dist. Clermont Nos. CA2014-01-003 and CA2014-07-049, 2014-Ohio-5082, ¶ 13.

**{¶18}** Appellant's second ground for relief alleged his trial counsel were ineffective for failing to object to the admission of the autopsy report and failing to object to Dr. Germaniuk's testimony. As noted above, appellant should have raised this issue in his direct appeal. Moreover, the Ohio Supreme Court found that the admission of the autopsy and Dr. Germaniuk's testimony were proper. Additionally, appellant also raised this issue in his appeal to the Ohio Supreme Court from our decision denying his application to reopen his appeal. The Supreme Court held that "the report and Germaniuk's testimony were both properly admitted. It follows, then, that the failure to object to such evidence was not deficient performance." *Adams*, 146 Ohio St.3d 232, at ¶ 21.

**{¶19}** Therefore, the trial court properly found appellant's second ground for relief was barred by the doctrine of res judicata.

**{¶20}** Appellant's third ground for relief alleged his trial counsel were ineffective for failing to retain a forensic pathologist to testify in his case-in-chief. Once again, this issue relies on the trial court record and could have been raised in appellant's direct appeal. In fact, appellant acknowledged as much in his petition for postconviction relief stating: "Evidence existed at the time of trial that was indicative of the need for the defense to consult with, and present testimony from, a forensic pathologist." (Postconviction Petition ¶ 25). Thus, appellant admitted that at the time of his direct

appeal, evidence existed on the record to challenge his trial counsel's effectiveness on the basis of failure to retain a forensic pathologist. Moreover, appellant was represented by new counsel on his direct appeal who could have raised this issue. *Carosiello*, 7th 2019-Ohio-2705 ¶ 28; *Sturgill*, 2014-Ohio-5082, ¶ 13. Furthermore, there is no indication by appellant that had trial counsel retained a forensic pathologist that the outcome of his trial would have been different. Therefore, the trial court properly found appellant's third ground for relief issue to be barred by the doctrine of res judicata.

**{¶21}** Appellant's eighth ground for relief alleged that he is innocent of Tenney's murder. He claimed no reasonable juror would convict him. In support, appellant cited to evidence presented at trial of possible alternate suspects; pointed out flaws with the eyewitness identification, which were apparent at trial; and argued again that his counsel should have retained a forensic pathologist to challenge the DNA evidence linking him to Tenney.

**{¶22}** In this ground for relief, it seems appellant is actually taking issue with the sufficiency of the evidence. He attacked the evidence presented at trial and the conclusions the jury drew, or failed to draw, from the evidence. Importantly, while appellant asserted he is actually innocent, he failed to point to any evidence, inside or outside of the record, to prove this.

**{¶23}** Sufficiency of the evidence is an issue that could have been raised in appellant's direct appeal. *State v. Jones*, 7th Dist. Mahoning No. 16 MA 0192, 2017-Ohio-9376, ¶ 21. Therefore, the trial court properly barred appellant's eighth ground for relief on the basis of res judicata.

**{¶24}** Accordingly, appellant's second assignment of error is without merit and is overruled.

**{¶25}** Appellant's first assignment of error states:

> THE TRIAL COUR ERRED IN DISMISSING ADAMS' POST-CONVICTION PETITION WHEN HE PRESENTED SUFFICIENT OPERATIVE FACTS TO MERIT RELIEF OR, AT A MINIMUM, AN EVIDENTIARY HEARING.

**{¶26}** In his first assignment of error, appellant argues that he presented sufficient evidence to support his claims of constitutional error so that the trial court should have granted him relief or at least held a hearing on his petition.

**{¶27}** An appellate court reviews a trial court's denial of a petition for postconviction relief under an abuse of discretion standard. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58. Abuse of discretion connotes more than an error of law; it implies the trial court acted arbitrarily, unreasonably, unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶28}** A postconviction petitioner is not automatically entitled to a hearing. *State v. Cole*, 2 Ohio St.3d 112, 443 N.E .2d 169 (1982). Before granting an evidentiary hearing on the petition, the trial court shall determine whether there are substantive grounds for relief. R.C. 2953.21(C). The trial court's decision of whether to hold an evidentiary hearing in postconviction matters is reviewed for abuse of discretion. *State v. Haschenburger*, 7th Dist. Mahoning No. 08-MA-223, 2009-Ohio-6527, ¶ 43.

**{¶29}** In his petition, appellant raised ten grounds for relief. As discussed in appellant's second assignment of error, the trial court properly dismissed grounds for relief one, two, three, and eight based on the doctrine of res judicata. Thus, in this assignment of error we will address appellant's remaining six grounds for relief.

**{¶30}** In appellant's fourth ground for relief, he argued juror misconduct occurred during the guilt-phase deliberations. He asserted that during the guilt phase of his trial, several jurors became aware of his previous rape conviction. In support, appellant attached Juror Maloney's affidavit.

**{¶31}** Juror Maloney averred that during both the guilt phase and the penalty phase he did not know that appellant had a prior conviction for rape. (Postconviction petition Ex. 3, ¶ 13). Although he did know that appellant had served a prior prison term. (Postconviction petition Ex. 3, ¶ 22). Juror Maloney averred that after the jury had completed deliberations in the penalty phase, the jurors went to lunch and one of the jurors (which one he was not entirely sure of), told him that appellant had previously been in prison for rape. (Postconviction petition Ex. 3, ¶ 5). He further averred that after the

court delivered the verdict, the jurors went out to eat again where another juror told him that appellant had been in prison for rape. (Postconviction petition Ex. 3, ¶ 6).

**{¶32}** Significantly, as the trial court pointed out in ruling on appellant's petition, Juror Maloney's affidavit does not assert that any juror knew of, or communicated, the fact that appellant had previously been convicted of rape *before* the jury reached its verdict in the penalty phase. Appellant has failed to produce any evidence that any of the jurors knew of his rape conviction before reaching their verdict.

**{¶33}** And as the trial court also pointed out, defense counsel disclosed to the jury that appellant had previously served a lengthy prison sentence. Thus, the fact that appellant had been in prison for a substantial amount of time was not something that the defense attempted to hide from the jury.

**{¶34}** Thus, the trial court did not abuse its discretion in overruling appellant's fourth ground for relief.

**{¶35}** In appellant's fifth ground for relief, he argued that Juror Sutton committed juror misconduct because she failed to disclose that she had been a victim of rape during voir dire. He claimed this omission deprived him of the right to a fair and impartial jury. In support, appellant again cited to Juror Maloney's affidavit. Juror Maloney averred that a "younger juror," who he believed to be Juror Sutton, was crying during the sentencing deliberations because she had been raped and she went into detail about it. (Postconviction petition Ex. 3, ¶ 21). Appellant also alleged that Juror Sutton was not forthcoming about a robbery she listed on her juror questionnaire.

**{¶36}** The state attached Juror Sutton's affidavit to its motion for summary judgment. In her affidavit, Juror Sutton averred that during the sentencing-phase deliberations she disclosed to the other jurors that she believed she had been the victim of a date rape but that she had no personal recollection of the event because she believed she had been given a "date rape drug." (State Motion for Summary Judgment Ex. 1, ¶ 3). She further averred that she had not considered this to be a crime because she never reported it to the police and person was never prosecuted. (State Motion for Summary Judgment Ex. 1, ¶ 4). For this reason, Juror Sutton believed that she answered her juror questionnaire, stating that she had never been a victim of a crime, truthfully. (State Motion

Case No. 18 MA 0116

for Summary Judgment Ex. 1, ¶ 5). Finally, she averred that her prior experience had no effect on her judgment in this case. (State Motion for Summary Judgment Ex. 1, ¶ 6).

**{¶37}** In order for a party to obtain a new trial based on a juror's failure to disclose information during voir dire, the "'party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.'" *State v. Williams*, 6th Dist. Lucas No. L-17-1186, 2019-Ohio-2657, ¶ 31, quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

**{¶38}** A court may infer bias on the part of a juror if it finds the juror deliberately concealed information during voir dire; however, if the concealment was unintentional, the appellant must show that the juror was actually biased. *State v. Williams*, 79 Ohio St.3d 1, 1997-Ohio-407, 679 N.E.2d 646 (1997), citing *Zerka v. Green* (C.A.6, 1995), 49 F.3d 1181, 1184-1186.

**{¶39}** In this case, the trial court correctly concluded the Juror Sutton did not fail to honestly answer a question. Juror Sutton stated in her affidavit that she did not consider herself to have been a victim of a crime because she could not recollect the event, she never reported anything to the police, and nobody was prosecuted. Thus, she believed she honestly answered her juror questionnaire. Moreover, as the trial court found, appellant did not present any evidence of bias or prejudice. Juror Sutton averred that her past experience had no effect on her judgment of this case.

**{¶40}** Thus, the trial court did not abuse its discretion in overruling appellant's fifth ground for relief.

**{¶41}** In appellant's sixth ground for relief, he argued he was denied effective assistance of counsel. He argued his trial counsel failed to reasonably investigate and present expert eyewitness identification testimony in order to discredit John and Sandra Allie's eyewitness of identification of him using Tenney's ATM card on the night she was murdered. In support, appellant attached the affidavit of Dr. Harvey Shulman, a psychologist with expertise in eyewitness identification. Dr. Shulman averred that he would have informed the jury of the frailties of eyewitness identification, the fact that the identification occurred at night, the lack of detail given by the Allies, the potential of undue influence, and the unreliability of cross-racial identifications.

**{¶42}** To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. *Id.* To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus.

**{¶43}** Appellant bears the burden of proof on the issue of counsel's ineffectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In Ohio, a licensed attorney is presumed competent. *Id.*

**{¶44}** At trial, the Allies both testified that they saw appellant at an ATM machine in front of Giant Eagle on the night Tenney was murdered. (Trial Tr. Vol. II, 291, 330). The two were waiting in their car for the person using the ATM (appellant) to finish. (Trial Tr. Vol. II, 293). John Allie testified that when appellant exited the ATM area, he stood in front of the Allies' car and waved to them. (Trial Tr. Vol. II, 294). John stated he was familiar with appellant from "around the neighborhood." (Trial Tr. Vol. II, 290). John also testified that it was still light out at the time. (Trial Tr. Vol. II, 301-302).

**{¶45}** The trial court overruled this ground for relief finding that it was within the realm of trial counsel's strategy to decide whether or not to retain an expert on eyewitness identification.

**{¶46}** Trial counsel's decision to forego an eyewitness-identification expert is a recognized trial strategy. *State v. Keeling*, 1st Dist. Hamilton No. C-010610, 2002-Ohio-3299, ¶ 8. In *State v. Madrigal*, 87 Ohio St.3d 378, 2000-Ohio-448, 721 N.E.2d 52, the Ohio Supreme Court commented on the defendant's claim that his counsel were ineffective for failing to retain an identification expert. The Court's comments are equally applicable here:

> Appellant was represented by two experienced trial attorneys who presumably were aware of the issues involving the evidence of identification. Appellant's counsel evidently decided not to request the

appointment of an eyewitness identification expert, choosing instead to rely on their cross-examination of the witnesses in order to impeach the eyewitnesses.

*Id.* at 390.

**{¶47}** Likewise, in this case appellant was represented by two experienced trial attorneys. They were presumably aware of the issues that surround eyewitness identification and made a tactical decision not to retain an expert on the subject. The trial court did not abuse its discretion in determining this was a matter of trial strategy and overruling appellant's sixth claim for relief.

**{¶48}** In appellant's seventh ground for relief, he asserted his trial counsel were ineffective for failing to retain and present testimony from a DNA expert. In support, appellant attached a letter from Julie Heinig, a laboratory director at DNA Diagnostic Center. In the letter, Heinig stated that she was unable to render an opinion on the DNA testing unless she was granted access to the entire case file.

**{¶49}** The state presented evidence at trial that the odds the DNA on Tenney's vaginal swab came from someone other than appellant were 1 in 38,730,000,000,000. The odds that the DNA on Tenney's underwear came from someone other than appellant were 1 in 63,490,000,000,000,000,000.

**{¶50}** In overruling this ground for relief, the trial court pointed out that appellant offered nothing more than speculation of an independent analysis.

**{¶51}** Counsel's failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel. *State v. Krzywkowski*, 8th Dist. Cuyahoga No. 83599, 2004-Ohio-5966, ¶ 21; citing *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993). "In many criminal cases, trial counsel's decision not to seek expert testimony 'is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant.'" *Id.* at ¶ 22, quoting *State v. Glover*, Clermont App. No. CA2001-12-102, 2002-Ohio-6392, ¶ 95.

**{¶52}** The trial court did not abuse its discretion in denying appellant's seventh ground for relief. As the court pointed out, appellant offered nothing to suggest that his counsels' performance was deficient. Instead, he only offered speculation that a review of the DNA testing might yield different results.

**{¶53}** In appellant's ninth ground for relief, he argued the cumulative effect of the many instances of ineffective assistance of counsel at trial violated his rights to counsel, a fair trial, and due process.

**{¶54}** The trial court found that appellant failed to show that he was denied a fair trial due to the cumulative effect of the alleged errors.

**{¶55}** Cumulative error provides that it is a cause for reversal when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each error alone does not individually constitute a cause for reversal. *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987). When this court finds no error, the doctrine does not apply. *State v. Lyons*, 7th Dist. Jefferson No. 16-JE-0008, 2017-Ohio-4385, ¶ 46.

**{¶56}** Because appellant's alleged instances of ineffective assistance of counsel are either meritless or are barred by the doctrine of res judicata, we cannot conclude that the trial court abused its discretion in finding appellant's ninth ground for relief to lack merit.

**{¶57}** Finally, in appellant's tenth ground for relief, he argued that the cumulative effect of all of the errors he alleged in his petition entitled him to relief.

**{¶58}** The trial court found that appellant failed to demonstrate that error existed on any of his other alleged grounds for relief and, therefore, he could not demonstrate cumulative error.

**{¶59}** Because appellant's alleged grounds for relief either lack merit or are barred by res judicata, the trial court did not abuse its discretion in overruling appellant's tenth ground for relief.

**{¶60}** Accordingly, appellant's second assignment of error is without merit and is overruled.

**{¶61}** Appellant's third assignment of error states:

> THE TRIAL COURT ERRED WHEN IT OVERRULED ADAMS'
> MOTION FOR LEAVE TO CONDUCT DISCOVERY.

**{¶62}** Appellant filed a motion for discovery on September 26, 2012, and requested discovery in his grounds for relief. By dismissing appellant's postconviction petition, the trial court impliedly overruled his request for discovery.

**{¶63}** Appellant argues the trial court should have granted him leave to conduct discovery on his petition. He acknowledges that the current state of the law does not mandate discovery in postconviction proceedings, but argues that it was warranted in this case.

**{¶64}** The Ohio Supreme Court has held "there is no requirement of civil discovery in postconviction proceedings." *State ex rel. Love v. Cuyahoga Cty. Prosecutor's Office*, 87 Ohio St.3d 158, 1999-Ohio-314, 718 N.E.2d 426. And this court has thoroughly addressed the issue of discovery in postconviction proceedings:

> In conclusion, state collateral review itself is not a constitutional right. *State v. Calhoun* (1999), 86 Ohio St .3d 279, 281. As appellant acknowledges, it is a civil attack on a judgment. See *id.* As such, the petitioner has only those rights granted by the statute. *Id.*; *State v. Steffen* (1994), 70 Ohio St.3d 399, 410. The post-conviction statute does not provide a right to discovery. See *State ex rel. Love v. Cuyahoga Cty. Pros. Office* (1999), 87 Ohio St.3d 158, 159 (refusing to issue a writ to compel prosecutor to provide records for petitioner to prepare post-conviction petition). Rather, it places the burden on the petitioner to produce collateral evidence in order to warrant an evidentiary hearing. *Calhoun*, 86 Ohio St.2d at 281.

> Thus, discovery is not required before determining whether an evidentiary hearing is warranted by a petition. *State v. Herring*, 7th Dist. No. 03MA12, 2004-Ohio-5357, ¶ 152 (no statutory right to discovery). No constitutional rights are violated by this rule. See *State v. Leonard*, 157 Ohio App.3d 653, 660, 2004-Ohio-3323, ¶ 10 (where the First District held that the failure of the statutes to provide discovery in the initial stages of a post-conviction proceeding does not contravene any state or federal constitutional right); *State v. Goff* (Mar. 5, 2001), 12th Dist. No. CA2-5-05-

041 (where the appellant raised the same assignment of error and cited the same federal circuit court case law that commented on the lack of traditional discovery in Ohio's post-conviction process). See, also, *Calhoun*, 86 Ohio St.2d at 281 (no constitutional right to post-conviction review).

*State v. Drummond*, 7th Dist. Mahoning No. 05 MA 197, 2006-Ohio-7078, ¶ 119-120.

**{¶65}** Thus, the trial court did not err in denying appellant's request for postconviction discovery.

**{¶66}** Accordingly, appellant's third assignment of error is without merit and is overruled.

**{¶67}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, P. J., concurs.

Robb, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

---

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**